IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FELIPE NAVARRO, as Personal Representative
of the Estate of Angel Daniel Navarro, deceased,
VANESSA SOLORZANO, as Guardian of
ARIEL AMIA NAVARRO and
ISABELLA SALEEN NAVARRO, Minors,
MONICA NAVARRO,
FELIPE MEZA NAVARRO,
and FELIPE MIGUEL NAVARRO,

       Plaintiffs,                      Case No. 2:16-cv-1180-JMC-CG

v.

STATE OF NEW MEXICO
DEPARTMENT OF PUBLIC SAFETY,
BOARD OF COMMISSIONERS
FOR THE COUNTY OF SOCORRO,
OFFICER FRANCIS ALGUIRE, Individually,
OFFICER JOSE CARLOS, Individually,
SHERIFF WILLIAM ARMIJO, Individually,
JOHN DOES 1-10, JANE DOES 1-10,

       Defendants.

**MEMORANDUM OPINION AND ORDER
GRANTING STATE DEFENDANTS' RENEWED MOTION FOR SUMMARY
JUDGMENT AND FOR QUALIFIED IMMUNITY ON PLAINTIFFS' EXCESSIVE
FORCE CLAIM; GRANTING STATE DEFENDANTS' RENEWED MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFFS' STATE LAW AND DERIVATIVE
CLAIMS; GRANTING COUNTY DEFENDANTS' AMENDED MOTION FOR
PARTIAL SUMMARY JUDGMENT NO. I: DISMISSAL OF FOURTH AMENDMENT
EXCESSIVE FORCE CLAIM; AND GRANTING COUNTY DEFENDANTS' AMENDED
MOTION FOR PARTIAL SUMMARY JUDGMENT NO. II: DISMISSAL OF
<u>PLAINTIFFS' STATE LAW CLAIMS</u>**

After Angel Daniel Navarro stole a car at knife-point, he led officers on a high-speed chase

on Interstate 25 between Albuquerque and Socorro, New Mexico. Francis Alguire, Jose Carlos,

and William Armijo, all law enforcement officers, shot Mr. Navarro at the conclusion of the

pursuit. Mr. Navarro died at the scene. Plaintiffs now bring claims under 42 U.S.C. § 1983 and

New Mexico state law against the law enforcement officers and derivative claims against the State of New Mexico Department of Public Safety and the Board of Commissioners for the County of Socorro. Defendants move for summary judgment based on qualified immunity and other grounds. For the reasons stated below, this Court grants Defendants' motions on the basis of qualified immunity.

## I.     Procedural History

On October 17, 2017, Defendants State of New Mexico Department of Public Safety, Officer Francis Alguire, and Officer Jose Carlos (collectively, "the State Defendants") filed two separate motions for summary judgment. The first addressed Plaintiffs' excessive force claim and the second addressed Plaintiffs' state law claims. Similarly, on November 12, 2017, Defendants Board of Commissioners for the County of Socorro and Sheriff William Armijo (collectively, "the County Defendants") filed two separate motions for summary judgment with one addressing the excessive force claim and the other addressing the state law claims. On May 31, 2018, the Clerk reassigned this civil action to the undersigned judge. On June 8, 2018, this Court entered an Order granting Plaintiffs' motion to amend their complaint, which mooted the motions for summary judgment.

Plaintiffs' Second Amended Complaint alleged five counts against Defendants: (1) excessive force by the individual defendants in violation of 42 U.S.C. § 1983; (2) violations of the New Mexico Tort Claims Act against the individual defendants for excessive force (battery); (3) negligent hiring, training, and supervision against the Department of Public Safety and the Board of Commissioners for the County of Socorro; (4) respondeat superior against the Department of Public Safety and the Board of Commissioners for the County of Socorro; and (5) loss of consortium for Plaintiffs Ariel Amia Navarro, Isabella Saleen Navarro, Monica Navarro, Felipe

Meza Navarro, and Felipe Miguel Navarro. The County Defendants again filed two separate summary judgment motions on June 21, 2018. The State Defendants filed their two separate summary judgment motions on June 22, 2018. In their motions, the State Defendants contend the officers are entitled to summary judgment and qualified immunity on Plaintiffs' excessive force claim because their use of force was not excessive under the circumstances. They posit the officers are entitled to summary judgment on Plaintiffs' battery claim because their use of force against Mr. Navarro was necessary and lawful. Finally, they argue the Department of Public Safety is entitled to summary judgment on Plaintiffs' negligent hiring, training, and supervision claim, respondeat superior claim, and loss of consortium claim because those claims are derivative of the excessive force and battery claims.

The County Defendants argue Sheriff Armijo is entitled to qualified immunity and that he used an objectively reasonable amount of force, entitling him to dismissal of both the excessive force and the battery claims. Like the State Defendants, the County Defendants also urge this Court to dismiss the negligent hiring, training, and supervision claim, respondeat superior claim, and loss of consortium claim because they are derivative of the excessive force and battery claims. The Parties subsequently filed responses and replies to the summary judgment motions. These motions are now fully briefed and are ripe for disposition.

## II.    Facts

On May 26, 2016, Pascal Faurie reached for his wallet at a parking lot pay station in Albuquerque, New Mexico. Faurie Dep. 22:15–23:1, April 14, 2017. Before he could pay, someone said, "Give me your keys." *Id.* Mr. Faurie turned around to find Felipe Navarro standing beside him. *Id.* Mr. Navarro pressed a knife against Mr. Faurie's ribs and told him that he was "not fucking kidding." Faurie Dep. 31:5–21. As Mr. Faurie reached for his keys, Mr. Navarro

said if he did not get the keys, he was "going to fucking stab [Mr. Faurie] in ten seconds." *Id.* Mr. Navarro then began a ten-second countdown. *Id.* After fumbling to find his keys for nine of those seconds, Mr. Faurie threw his keys at Mr. Navarro, which hit Mr. Navarro's face. Faurie Dep. 34:8–35:19. Mr. Navarro lunged at Mr. Faurie, cut Mr. Faurie's finger, leaned over, and scrambled to pick up the keys. *Id.* Mr. Navarro ran to Mr. Faurie's Toyota Sequoia and drove away. *Id.*

Mr. Faurie reported the incident to the Albuquerque Police Department, which issued a "be on the lookout" (BOLO) for the Sequoia. Alguire Dep. 38:8–21. New Mexico State Police Officers Francis Alguire and Jose Carlos as well as Socorro County Sheriff William Armijo responded to the BOLO. These officers testified at their depositions that they knew from the BOLO and further communication with dispatch prior to the traffic stop that a suspect, possibly armed and dangerous, fled from the scene of an armed robbery involving a stabbing in a stolen Toyota Sequoia with damage to the left rear taillight.[1] Alguire Dep. 43:24–44:21, 45:21–46:3, 46:22–47:19; Carlos Dep. 57:21–25, 58:13–59:5, 70:2–18; Armijo Dep. 89:21–90:2.

Sheriff Armijo first spotted Mr. Navarro while he was transporting an inmate northbound on Interstate 25. Def. Sheriff William Armijo's Answers to Pl.'s First Set of Interrogs. to Def. William Armijo, at 11. At approximately 12:17 p.m., Sheriff Armijo pulled into the median and made a U-turn to proceed southbound on Interstate 25. *Id.* Sheriff Armijo confirmed with dispatch

---

[1] Officer Alguire testified in his deposition that he learned that the robbery of the vehicle involved a stabbing prior to the shooting. Alguire Dep. 46:22–47:19. Plaintiffs argue that Defendants knew at the time of the shooting that the "stabbing" was merely a "minor cut on the finger." This factual dispute is not material. Regardless of the injury that Mr. Faurie sustained as a result of Mr. Navarro's actions and communicated to law enforcement, under either factual scenario law enforcement officers knew that Mr. Navarro stole a car, did so with a knife, and had a dangerous weapon on his person. This Court agrees with Plaintiffs that the officers' subjective beliefs are not controlling, and that it must instead look to whether reasonable officers in the same circumstances would have concluded that a threat existed justifying the particular use of force. *Graham v. Connor*, 490 U.S. 386, 394 (1989).

4

that the vehicle he spotted was the vehicle Mr. Navarro had stolen. *Id.* While waiting for backup to arrive, Sheriff Armijo followed Mr. Navarro at a distance of two to three car lengths without engaging his siren or lights. *Id.* Detective Richard Lopez of the New Mexico Institute of Mining and Technology joined the pursuit. *Id.* At approximately 12:22 p.m., Mr. Navarro passed Officer Alguire, who was parked in the median. Alguire COBAN 12:22:34. Officer Aguire drove a cruiser equipped with a COBAN/dashboard video camera, which captured the entire incident at issue in this case. Officer Alguire began following Mr. Navarro in the left-hand lane of southbound Interstate 25. *Id.* at 12:22:24. Sheriff Armijo requested over the radio that Officer Alguire take over the lead position of the pursuit. Def. Sheriff William Armijo's Answers to Pl.'s First Set of Interrogs. to Def. William Armijo, at 12. Three minutes later, once Officer Carlos joined the pursuit, Officer Alguire initiated his emergency lights and siren. Alguire COBAN 12:26:24. Mr. Navarro did not pull over. Instead, he led law enforcement on an approximately four-minute high-speed chase.[2] *Id.* 12:26:24–12:30:10.

Mr. Navarro eventually stopped at approximately 12:30 p.m. *Id.* But instead of pulling off the interstate, Mr. Navarro stopped the Sequoia in the right-hand lane. *Id.* Five seconds later, Officer Alguire commanded Mr. Navarro to exit the vehicle—eventually doing so three times. *Id.* at 12:30:15–12:30:29. Mr. Navarro did not exit the vehicle. Less than ten seconds later, Sheriff Armijo used his PA system to command Mr. Navarro to open the door, keep his hands in the air,

---

[2] Plaintiffs dispute that Mr. Navarro led the officers on a high-speed chase because they claim the GPS device monitoring the speed on the COBAN video has not been tested. The exact speed at which Mr. Navarro was driving is not material. The law enforcement officers testified he was speeding, so much so that Sheriff Armijo's vehicle could not keep up with the pursuit at times. Def. Sheriff William Armijo's Answers to Pl.'s First Set of Interrogs. to Def. William Armijo, at 12. Plaintiffs provide no evidence to rebut the otherwise undisputed fact that Mr. Navarro fled from law enforcement and did not immediately pull over after officers employed their lights and sirens.

and face the front of the vehicle.  *Id.* at 12:30:36–12:30:49.  Mr. Navarro still did not exit the

vehicle, but he opened the driver's side door and looked back at the officers.  *Id.* at 12:30:44.

Approximately forty seconds after Mr. Navarro stopped the vehicle, Officer Alguire shouted, "He

said he's got a gun."  *Id.* at 12:30:50.  Although Mr. Navarro's voice is not audible on the COBAN

video, both Officer Alguire and Sheriff Armijo testified that Mr. Navarro made the statement.[3]

Alguire Dep. 92:22–93:3; Armijo Dep. 133:3–8.

Sheriff Armijo continued to command Mr. Navarro over the PA to "[F]ace the front of the

vehicle; keep your hands in the air, we don't want you to get hurt."  Alguire COBAN 12:30:52–

12:31:01.  At 12:31 p.m., fifty seconds after stopping his vehicle and approximately twenty-six

seconds after Sheriff Armijo used the PA system, Mr. Navarro stepped out of the Sequoia.  *Id.* at

12:31:01.  As he exited, Sheriff Armijo commanded: "Just face the front of the vehicle; put your

hands in the air; put your hands in the air."  *Id.* at 12:31:01–12:31:06.  Rather than obey the

commands, the COBAN video shows that Mr. Navarro kept his right hand under his shirt in his

---

[3] As will be discussed in more detail below, Plaintiffs argue that the COBAN video, which shows the incident in its entirety, cannot control the factual record because it does not present all the relevant facts.  In making that argument, they contend that Officer Alguire and Officer Carlos' depositions "are essential to this case concerning the information that was known by Officer Alguire and Officer Carlos at the time of the incident."  Yet, at the same time, Plaintiffs argue that Mr. Navarro did not make the statement that he had a gun *because the statement cannot be heard on the COBAN video.*  Therefore, according to Plaintiffs, this Court should not credit the deposition testimony.  Although this Court views the evidence in the light most favorable to Plaintiffs, the law is clear that this Court should view the facts in the light depicted by the videotape, but to the extent the video does not capture everything that occurred, this Court will review all summary judgment evidence.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Plaintiffs retained an expert witness, Raimond Carrillo, to conduct an analysis of the audio and video recordings.  Carillo said he enhanced the audio and video but could not recover any mention of a gun from Mr. Navarro.  Defendants objected based on Mr. Carrillo's qualifications to offer an opinion regarding forensic analysis of the audio and video recordings.  Plaintiffs provide no evidence to counter Officer Alguire's testimony other than the proffered expert's opinion that the statement cannot be heard on the video.  With that said, whether Mr. Navarro actually made the statement has no impact on the result in this case.  Mr. Navarro's actions, regardless of whether he said he had a gun, would cause a reasonable officer to fear for his life.

waistband.  *Id.*  In response to Mr. Navarro's actions, Sheriff Armijo told Mr. Navarro to "[k]eep your hands off that weapon sir; put your hands in the air."  *Id.* at 12:31:06–12:31:09.  Mr. Navarro then turned his body toward Officer Alguire so that his side faced Officer Alguire.  *Id.*  At that point, Mr. Navarro brought his left hand down together to join his right hand at the waist.  *Id.*  Then, in split-second fashion, he gripped his hands together, raised them upwards, and charged the officers.  *Id.*

Upon being charged—approximately nine seconds after Mr. Navarro exited the vehicle—Officers Alguire and Carlos fired multiple shots at Mr. Navarro.  *Id.* at 12:31:10.  Mr. Navarro collapsed to the ground.  *Id.*  As he lay on the ground with his hands outstretched in front of him, Mr. Navarro suddenly pushed his upper body off the ground six seconds after the first round of shots and looked directly at law enforcement.  *Id.* at 12:31:16.  He did this while he moved his hands down near his waist.  *Id.*  Officers Alguire and Carlos, along with Sheriff Armijo, fired another round of shots, which killed Mr. Navarro.[4]  *Id.*  In total, law enforcement shot twenty-eight times at Mr. Navarro with the majority of the shots occurring during the second discharge.  Detective Lopez did not fire any shots.  Alguire Dep. 125:17–22; Carlos Dep. 120:8–17; Armijo Dep. 152:14–19.  After the shooting, the officers learned that Mr. Navarro did not have a firearm in his possession and that Mr. Navarro had both methamphetamine and components of marijuana in his blood.  Office of the Medical Investigator: Report of Findings, at 2.

---

[4] The State Defendants argue in their summary judgment motion that Plaintiffs cannot maintain a "Failure to Render Aid Claim."  Plaintiffs did not expressly allege a failure to render aid claim in their Complaint and fail to respond to the argument in their response to the motion for summary judgment.  If Plaintiffs brought such a claim, they have waived it.  *Pater v. City of Casper*, 646 F.3d 1290, 1299 (10th Cir. 2011) (holding that the liberalized pleading rules do not allow plaintiffs "to wait until the last minute to ascertain and refine the theories on which they intend to build their case").

## III.    Applicable Law

### A.  Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing [substantive] law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant."  *Libertarian Party of NM v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (internal quotation marks omitted).  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  The Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

### B.  Qualified Immunity

Title 42 U.S.C. § 1983 "allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law."  *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).  An individual defendant named in a § 1983 action may raise a defense of qualified immunity, which "shields public officials . . . from damages

actions unless their conduct was unreasonable in light of clearly established law." *Id.* Once a defendant asserts qualified immunity, the plaintiff bears the burden to show that (1) a reasonable jury could find facts establishing that the defendant violated a federal constitutional or statutory right, and (2) the right was clearly established at the time of the defendant's unlawful conduct. *Id.* The Court may decide these prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

IV.   <u>Analysis</u>

A. <u>Section 1983 Excessive Force Claim</u>

1. <u>The Law Enforcement Officers Did Not Violate the Fourth Amendment</u>

Plaintiffs brought this action under 42 U.S.C. § 1983, which "allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law." *Estate of Booker*, 745 F.3d at 411. A claim of excessive force by a law enforcement officer implicates the constitutional rights of an individual to be free from unreasonable search and seizure under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). To prevail on an excessive force claim under the Fourth Amendment, "plaintiffs must show *both* that a 'seizure' occurred and that the seizure was 'unreasonable.'" *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010). The parties do not dispute that law enforcement officers seized Mr. Navarro when they shot him. Accordingly, the Court focuses on whether the uncontested seizure was reasonable.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). The Supreme Court has long cautioned that the test of objective reasonableness under the Fourth Amendment is not capable of

9

precise definition or mechanical application.  *Id.*  Instead, a court must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  "The reasonableness of [the officers'] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [the officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."  *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995).

Deadly force is force that creates a substantial risk of causing death or serious bodily harm. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1313 (10th Cir. 2009).  The use of deadly force is considered reasonable "only if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."  *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).  In assessing the degree of threat the suspect poses to officers, this Court considers factors that include, but are not limited to: (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon toward the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.  *Estate of Larsen*, 511 F.3d at 1260.

A reviewing court judges the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

situation." *Id.* at 396–97. Significantly, the "reasonableness" inquiry in an excessive force case is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Evil intentions do not make a Fourth Amendment violation out of an objectively reasonable use of force and good intentions do not make an objectively unreasonable use of force constitutional. *Id.* The Fourth Amendment requires only that law enforcement officers choose a reasonable method to end the threat that the suspect poses to the officers in a force situation, regardless of the availability of less intrusive alternatives. *Id.*

In determining the reasonableness of the manner in which a seizure is effected, the Court balances the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. *Scott v. Harris*, 550 U.S. 372, 383 (2007). In doing so, the Court considers the three non-exclusive factors set forth in *Graham* and the four factors articulated in *Estate of Larsen* to shed light on whether a constitutional violation occurred. Here, the Court must examine the unique circumstances and the information known to the officers immediately before they shot Mr. Navarro. The Court analyzes the *Graham* factors viewing the facts in the light most favorable to Plaintiffs. "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The existence in the record of a video recording capturing the events in question, however, adds a wrinkle to this analysis. *Id.* Plaintiffs make no allegations that any person doctored or altered the recording. Plaintiffs argue, though, the dashboard recording does not control the factual record. They assert that the officers' depositions, not the video recording, controls what the officers knew. Plaintiffs also contend, despite the fact the entire incident is captured on the recording, the video does not capture the number of shots fired, the

target on Mr. Navarro's body that the officers aimed for, the time the injuries occurred, or the number of officers at the scene. Moreover, Plaintiffs argue that the video is "subject to interpretation."

To the extent that Plaintiffs assert the recording does not control the factual record as to what the law enforcement officers witnessed once the pursuit began, they are incorrect. Any suggestion that the COBAN video does not control the factual record is in stark contrast to clear precedent from both the United States Supreme Court and the United States Court of Appeals for the Tenth Circuit. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1207 (10th Cir. 2017) (stating a court "cannot ignore clear, contrary video evidence in the record depicting the events as they occurred") (citing *Scott*, 550 U.S. at 380). Indeed, when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. The video presents a clear picture of Mr. Navarro's actions from the beginning of the pursuit through both rounds of shots fired. At no point does anyone or anything obstruct the camera's view of Mr. Navarro. The COBAN video provides an uninterrupted view of everything that law enforcement encountered during the incident. Plaintiffs are correct, however, that this Court should rely on record evidence, such as deposition testimony, to determine what officers knew about Mr. Navarro when the pursuit began. Thus, the Court will "view[] the facts in the light depicted by the videotape." *Id.* at 381. And to the extent the video did not capture everything that occurred, this Court will view the evidence in the light most favorable to Plaintiffs. *Durastanti*, 607 F.3d at 659.

The first *Graham* factor, the severity of the crime at issue, weighs in favor of the law enforcement officers. Law enforcement initiated the stop because they were aware Mr. Navarro

allegedly committed two first degree, violent felonies: armed robbery and aggravated battery. *See* NMSA 1978 § 30-16-2 (stating that robbery accomplished with the use of a deadly weapon is a first degree felony); NMSA 1978 § 30-3-5 (stating that aggravated battery consists of battery with a deadly weapon). Moreover, once Mr. Navarro decided to flee from a lawful traffic stop, he committed the additional felony of aggravated fleeing and reckless driving. *See* NMSA 1978 § 30-22-1.1 (aggravated fleeing); NMSA 1978 §66-8-113 (reckless driving). These offenses are enough to tip the first *Graham* factor in favor of the law enforcement officers. *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011) (noting the first *Graham* factor weighed in favor of officers where the plaintiff stole a vehicle, which is a felony); *Rion v. Medrano*, 11-cv-269, 2014 WL 12798359 (D.N.M. Jan. 30, 2014) (noting that aggravated battery with a deadly weapon is an inherently violent crime when analyzing the first *Graham* factor); *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014) (holding that law enforcement officers acted reasonably when the officers used deadly force to terminate a high-speed chase that lasted for over five minutes and posed a grave public safety risk).

The particular felony of fleeing from a lawful traffic stop dovetails with the third *Graham* factor; whether the suspect is actively resisting arrest or attempting to evade arrest by flight. In this case, Mr. Navarro fled from the police on Interstate 25—a busy Interstate highway. Accordingly, the third *Graham* factor also weighs in favor of the law enforcement officers.

The second *Graham* factor, whether the suspect poses an immediate threat to the safety of the officers or others, clearly favors the law enforcement officers and is critical to the outcome here. The Court reaches this conclusion after first considering whether the law enforcement officers "could have reasonably perceived [they were] in danger at the precise moment that [they] used force and whether [their] own reckless or deliberate conduct (as opposed to mere negligence)

unreasonably created a need to use force." *Durastanti*, 607 F.3d at 664. Judging the matter on this basis, the law enforcement officers did not violate the Fourth Amendment. The recording makes clear Mr. Navarro posed an actual and imminent threat to the lives of other civilian motorists and to the officers involved in the chase. *Id.*

Once Mr. Navarro decided to stop the vehicle after leading the officers on a high-speed chase, he did not pull off to the side of the road. Rather, he stopped his car in the right lane of the interstate. He remained in the vehicle for fifty seconds, although the law enforcement officers repeatedly ordered him to exit the vehicle. Once he exited the vehicle, Mr. Navarro reached for his waistband in a manner that indicated he was reaching for a weapon despite Sheriff Armijo's instruction to keep his hands off that weapon. He then charged at the law enforcement officers. Law enforcement fired, marking the first occasion that Plaintiffs allege excessive force. While on the ground, Mr. Navarro lifted up his body, looked directly at the law enforcement officers, and again reached for his waistband. The law enforcement officers then fired additional shots, marking the second occasion that Plaintiffs allege excessive force. Based on these facts—as clearly shown in the COBAN video—a reasonable officer in this position "would have feared for his life" before both the first and the second round of shots. *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009); *see also Anderson v. Russell*, 247 F.3d 125, 130 (4th Cir. 2001) (holding summary judgment appropriate for officers where officers shot a plaintiff when that plaintiff lowered his hands in the direction of his waistband in disregard of the officers' orders); *Salazar-Limon v. City of Houston*, 137 S. Ct. 1277, 1281 (Sotomayor, J., dissenting) ("Indeed, the courts below needed to ask only one question: Did Salazar-Limon turn and reach for his waistband, or not? If he did, Thompson's use of force was reasonable."). Accordingly, the law enforcement officers acted reasonably in firing both rounds of shots at Mr. Navarro. Even if they were mistaken as to the imminence of the

threat to their safety, the law of this Circuit makes clear "[a]n officer may be found to have acted reasonably even if he has a mistaken belief." *Durastanti*, 607 F.3d at 666. To be sure, a "reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions." *Estate of Larsen*, 511 F.3d at 1260.

As to the first round of shots fired, Plaintiffs contend that the officers' own reckless or deliberate conduct unreasonably created the need to use force. Specifically, Plaintiffs contend the officers acted recklessly when they repeatedly ordered Mr. Navarro to exit the vehicle. Instead, Plaintiffs assert Officer Alguire should have commanded Mr. Navarro to stay in the vehicle, turn off the car, and throw the car key to allow communication to begin. Plaintiffs argue that Officer Alguire's decision to order Mr. Navarro out of the car immediately "triggered the use of force" that would not have occurred had he first asked Mr. Navarro to turn off the car and throw the car key out the door. The Court concludes Officer Alguire and Sheriff Armijo did not act recklessly when they ordered Mr. Navarro to immediately exit the car. It is well-settled that during a lawful traffic stop, officers may order passengers out of a vehicle as a matter of officer safety. *Maryland v. Wilson*, 519 U.S. 408 (1997); *see also United States v. Ladeaux*, 454 F.3d 1107, 1110 (10th Cir. 2006).

In support of their contention that the use of force would not have been needed had the officers asked Mr. Navarro to turn his car off and throw his keys out the window, Plaintiffs cite *Myers v. Oklahoma County Board of County Commissioners*, 151 F.3d 1313 (10th Cir. 1998). That case, however, did not involve a person in a vehicle but instead involved an apartment building at which the plaintiff was staying. In *Myers*, law enforcement officers spent hours attempting to resolve a situation through non-confrontational communication with the plaintiff to no avail before using force. Nothing in *Myers* requires that officers spend hours attempting to

resolve a situation through non-confrontational communication, whether in an apartment building or in a vehicle. The case is particularly inapposite in this factual scenario where Plaintiff led officers on a high-speed chase down a busy interstate highway. The chase gave officers a strong incentive to immediately separate Plaintiff from his vehicle to prevent further danger to other drivers. Certainly, the facts presented here do not require the prolonged negotiations that took place in *Myers*. In this case, the law enforcement officers did not act recklessly in ordering Mr. Navarro out of the vehicle. Accordingly, the officers' conduct did not unreasonably create the need to use force.

Moreover, Plaintiffs' additional objections to the second round of shots are immaterial to the question of whether law enforcement officers could have reasonably perceived they were in danger at the precise moment they used force. Despite the clear and irrefutable video of the shooting, Plaintiffs contend the alleged moments in between the first and second round of shots are in dispute. Specifically, Plaintiffs cite the medical investigator's findings (which do not definitively state or suggest Mr. Navarro's movements were involuntary) to argue that the bullet wounds show that Mr. Navarro's movement in the six seconds between the first and second round of shots were involuntary spasms rather than a threatening move against the officers. In addition, Plaintiffs seek to use expert testimony to establish that Mr. Navarro was no longer a threat to the law enforcement officers after the first round of shots.[5]

---

[5] Plaintiffs retained an expert, Roger Clark, as a police procedures expert. Experts such as Clark may opine on whether a municipality is liable for failing to properly train or supervise an officer with respect to the use of force. *L'Esperance v. Mings*, 02-cv-258, 2003 WL 25692557, at *3–4 (D.N.M. July 14, 2003). Any opinion that officers acted unconstitutionally or exercised excessive force is not appropriate. *Id.*; *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001). It would also be inappropriate for Clark to offer opinions as to Mr. Navarro's state of mind and any medical diagnosis. Defendants likewise retained use of force experts. In this case, the entire incident was captured on video. The video provides clear justification for the use of force in this case.

Examining medical evidence after the shooting to determine whether Mr. Navarro was actually incapacitated and his body was engaging in involuntary spasms is exactly the type of "20/20 vision of hindsight" the Supreme Court prohibits. *Graham*, 490 U.S. at 396. What the officers witnessed in that six seconds is not in dispute. The COBAN video shows that after the first round of shots, Mr. Navarro again reached for his waistband while looking at the officers. Existing case law clearly demonstrates that an officer in the same position would reasonably believe his life was still in danger and Mr. Navarro was still a threat. *Anderson*, 247 F.3d at 130 (holding summary judgment appropriate for officers where officers shot a plaintiff when that plaintiff lowered his hands in the direction of his waistband in disregard of the officers' orders); *see also Salazar-Limon*, 137 S. Ct. at 1281 (Sotomayor, J., dissenting) ("Indeed, the courts below needed to ask only one question: Did Salazar-Limon turn and reach for his waistband, or not? If he did, Thompson's use of force was reasonable."). And as mentioned above, "[a]n officer may be found to have acted reasonably even if he has a mistaken belief." *Durastanti*, 607 F.3d at 666. In this case, the video shows Mr. Navarro reaching for his waistband a second time. Only seconds before, Mr. Navarro had reached for his waistband and charged at the officers. An officer who faces such a situation in a six second time period does not have the time to medically assess whether a movement is voluntary or involuntary. The officers here would have little to no reason to infer that it was Mr. Navarro's intention to surrender. Indeed, all signs pointed toward a continuation of the threat. *See Ambruster v. Marguccio*, 05-cv-344J, 2006 WL 3488969, *6 (W.D. Pa. Dec. 4, 2006) (concluding that a reasonable officer observing all the facts surrounding the plaintiff's arrest, especially the allegedly involuntary movements of Plaintiff's body, could have reasonably believed the force used was necessary).

While forcefully and correctly arguing that the law enforcement officers' subjective thoughts are not relevant to this Court's analysis, Plaintiffs seek to inject *Mr. Navarro's* possible thoughts into the analysis. Plaintiffs speculate that Mr. Navarro *may* have been confused and disoriented by the lights on the police cruisers. Plaintiffs additionally surmise that *maybe* Mr. Navarro did not understand the orders the law enforcement officers shouted to him. Just as this Court does not consider the law enforcement officers' expressed subjective thoughts, it also does not consider possible thoughts that Plaintiffs are not even sure Mr. Navarro had at the time of the incident.[6] *See Wilson v. Meeks*, 52 F.3d 1547, 1553–54 (10th Cir. 1995) ("Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant. It requires that he react reasonably to a threat."). What matters is what a reasonable officer on the scene would think and how that officer would react to a threat. And in this case, a reasonable officer confronted with a man that leads officers on a high speed chase, stops his vehicle in the middle of the interstate, waits almost a minute to get out, ignores all officer commands, puts his hands at his waist, charges at the officers before going down, and ultimately reaches for his waist again while looking right at the officers, would have reason to believe his life was in danger.

Plaintiffs, in their briefs, cite to many cases to argue the officers employed an unreasonable amount of force. The facts of this case are distinguishable from those cited by Plaintiffs. In *Margeson v. White County, Tennessee*, 579 F. App'x. 466, 468 (6th Cir. 2014), three officers fired

---

[6] The County Defendants retained an expert to offer opinions based upon his review of depositions of Mr. Navarro's medical providers and family members, as well as records leading up to the shooting. This expert, Dr. Daniel Duhigg, planned to testify at trial that Mr. Navarro had a number of risk factors for suicide and that Mr. Navarro's use of various illegal narcotics would have impacted his judgment. The County Defendants believe that Dr. Duhigg would testify that Mr. Navarro's actions are consistent with "suicide by cop." Whatever Mr. Navarro's subjective thoughts were at that moment are not material to the question this Court must answer. Accordingly, this Court will not consider Dr. Duhigg's testimony.

at Mr. Margeson as many as 43 times. In that case, the Court acknowledged that the plaintiff credibly alleged that the officers continued to shoot Mr. Margeson after he no longer posed any reasonable threat. *Margeson*, 579 F. App'x at 472. The officers' assertion that Mr. Margeson pointed a second gun after he fell to the ground was in dispute. *Id.* The court also suggested a dispute existed as to whether the two officers who did most of the shooting after the initial round of shots ever saw a gun or perceived any threat after the first round of shots. *Id.* In addition, the officers provided no explanation in their deposition for the reasonableness of the final twelve shots. *Id.* By contrast, in this case, the facts captured by Officer Alguire's COBAN video show that Mr. Navarro's hands were undisputedly headed toward his waistband right before law enforcement shot him. And the video is bolstered by, the law enforcement officers' explanation of the reasonableness of their shots.

Plaintiffs allege that Sheriff Armijo automatically discharged too many shots "without stopping or even pausing between rounds to assess the situation and independently justify each time that he used deadly force against Mr. Navarro." To end a threat to officer or public safety, an officer may shoot until the threat has ended. *Angilau v. United States*, 2:16-cv-992, 2018 WL 1278393, *4 (D. Utah March 9, 2018) (citing *Plumhoff*, 134 S. Ct. at 2022). In *Plumhoff*, the Supreme Court rejected the contention that, even if the use of deadly force was permissible, the petitioners acted unreasonably in firing a total of fifteen shots. The Court explained that it "stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff*, 134 S. Ct. at 2022. The Court continued, "if lethal force is justified, officers are taught to keep shooting until the threat is over." *Id.* In *Plumhoff*, during the ten-second span when the shots were fired, the suspect never abandoned his attempt to flee. *Id.* Here, as in *Plumhoff*, it would be different if the

first round had *clearly* incapacitated the suspect or if he had *clearly* given himself up. But that is not what happened in either case.

Plaintiffs attempt to distinguish *Plumhoff* by stating that the case speaks in terms of "public safety" rather than "officer safety." But *Plumhoff* involved a similar scenario to the present case. Rickard engaged in a five-minute car chase, including the passing of other motorists, which "posed a grave public safety risk" until his car came to a temporary standstill and officers began shooting. Significantly, the second *Graham* factor speaks in terms of both officer and public safety. Thus, *Plumhoff's* holdings apply to this case and the law enforcement officers are not required to stop shooting until the threat against their lives is over.

Next, Plaintiff cites *Brockington v. Boykins*, 637 F.3d 503 (4th Cir. 2011), a factually inapposite case involving an execution-style officer shooting. In *Brockington*, the Complaint alleged an officer fired two shots at Brockington. *Brockington*, 637 F.3d at 505. The first shot hit his left hand, almost severing a finger. *Id.* The second shot hit his upper abdomen and caused Brockington to fall from some stairs onto a cement landing. *Id.* Brockington could not get up and was lying on his back. *Id.* The officer then came and stood directly over him and fired at least six shots at close range. *Id.* Brockington did nothing to defend himself except raise his hands and sway them from side to side to protect his face. *Id.* The officer then fled the scene. *Id.*

The facts of *Brockington* are not present in this case. Here, Mr. Navarro was not lying helpless on the ground prior to the second round of shots. Rather, he moved his body—specifically, his hands toward his waistband—an action courts have held may justify the use of deadly force. *Anderson*, 247 F.3d at 130; *Salazar-Limon*, 137 S. Ct. at 1281 (Sotomayor, J., dissenting). Unlike the officer in *Brockington*, a reasonable law enforcement officer in this case would have feared for his life prior to taking the second round of shots.

Plaintiffs additionally cite *Graves v. Zachary*, 277 F. App'x. 344 (5th Cir. 2008) for the same proposition. But again, no video captured the incident, so the underlying facts were in dispute. The impact of the first shot on Graves was disputed. *Graves*, 277 F. App'x. at 346. The officers said that Graves did not slump down or drop his weapon after the first shot, but Graves said that he was incapacitated and an officer shot him in the chest after a short delay. *Id.* Unlike this case, under Graves' version of the facts, he was incapacitated and not attempting to aim or draw his weapon at the officers.

Finally, Plaintiffs cite *David v. City of Bellevue, Ohio*, 706 F. App'x 847 (6th Cir. 2017). In *David*, the parties presented no video evidence. Witness testimony diverged on whether; (1) David pointed a gun at an officer; (2) David raised his arm; and (3) David swung his arm out toward another officer while he was down. *David*, 706 F. App'x at 851–53. The Sixth Circuit stated the shooting would be unjustified if he had not raised his arm. *Id.*

*David* is not persuasive in the context of the present facts. Here, the COBAN video demonstrates that a reasonable officer faced with the same situation would believe that his life was in danger right before the second round of shots. In the video, Mr. Navarro does not appear incapacitated when his body lifts off the ground and his hands go to his waist. The cases Plaintiffs cite make the assumption that the officers knew the plaintiff was incapacitated at the second round of firing. That is not the factual scenario in this case where a plain and fair viewing of the video shows what could reasonably be perceived as a hostile move by Plaintiff at the time of the second round of shots.

Having concluded the *Graham* factors weigh in favor of Defendants, the Court now turns to the four factors articulated in *Estate of Larsen*. Applying the four factors, this Court concludes that the degree of threat, viewed alongside the *Graham* factors, favors granting qualified immunity

to the officers. These factors indicate "from the perspective of a reasonable officer on the scene, the totality of circumstances justified the use of force." *Thomson*, 584 F.3d at 1319. First, the officers ordered Mr. Navarro to get out of his vehicle, and Sheriff Armijo expressly ordered him not to touch his weapon. Rather than comply and put his hands up, Mr. Navarro reached toward his waistband as if grabbing something and charged toward the officers in complete disregard of law enforcement commands. Second, Mr. Navarro twice reached for his waistband—a hostile motion. *Anderson*, 247 F.3d at 130; *Salazar-Limon*, 137 S. Ct. at 1281 (Sotomayor, J., dissenting). Third, the officers were not far from the suspect and shielded only by car doors that were not bullet proof. Fourth and finally, Mr. Navarro gave no indication that he was surrendering. In fact, the video appears to show the opposite. Accordingly, with the totality of the factual circumstances in mind, the *Estate of Larsen* factors—viewed alongside the variables that *Graham* specifically identifies—powerfully support the officers' position that their use of deadly force was reasonable in this case.

For the reasons stated above, Plaintiffs have failed to establish a constitutional violation under the Fourth Amendment because they did not demonstrate the shooting of Mr. Navarro was objectively unreasonable. As a result, they cannot defeat the officers' defense of qualified immunity.

## 2. The Conduct Was Not Clearly Established

Even if the officers' conduct constituted excessive force under the Fourth Amendment, the law was not clearly established at the time of the shooting that their conduct was unlawful. "Typically, a preexisting Supreme Court or Tenth Circuit decision, or the weight of authority from other circuits, must make it apparent to a reasonable officer that the nature of his conduct is unlawful." *Carabajal*, 847 F.3d at 1210. Although Supreme Court "caselaw does not require a

case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).[7] "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* The Supreme Court has made clear that a court should not "define clearly established law at a high level of generality." *Id.*

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus law enforcement officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (internal quotation marks omitted and emphasis deleted). "Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted).

---

[7] In this Court's June 8, 2018 Order Granting Plaintiffs' Motion for Leave to File a Second Amended Complaint, this Court stated, "Any renewed motions for summary judgment and responses shall address the United States Supreme Court's decision in *Kisela v. Hughes*, 138 S. Ct. 1148 (2018). Plaintiffs did not reference *Kisela* in their response briefs. After Defendants pointed this out in their reply briefs, Plaintiffs filed a Motion Seeking Leave to File Surreplies. In that motion, Plaintiffs argue they addressed *Kisela* by inserting language from *Hope v. Pelzer*, 536 U.S. 730 (2002), to show an alleged conflict between Supreme Court precedent concerning clearly established law for qualified immunity. Plaintiffs seek to file a surreply to "clarify" their position on *Kisela* and to address the alleged conflict between *Kisela* and *Hope*. This Court denies Plaintiffs' Motion Seeking Leave to File Surreplies. *Kisela* clearly compels this Court to grant qualified immunity where no existing precedent places the statutory or constitutional question beyond debate. That is the case here. No officer would have known that shooting Mr. Navarro in the interest of safety would violate the Fourth Amendment.

Although general statements of the law can potentially give clear warning to officers, the general rules set forth in *Graham* do not by themselves create clearly established law outside an obvious case. *Id.* "Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id.* A law enforcement officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023.

The officers in this case shot Mr. Navarro when he presented a danger to public and officer safety. Before the first round of shots, Mr. Navarro disregarded the officers' commands, reached for his waistband, and charged at the officers. No reasonable officer would believe such a shooting would violate the Fourth Amendment. Mr. Navarro lay on the ground before the second round of shooting. However, he again reached for his waistband as his body lifted off the ground mere seconds after he had reached for his waistband and charged at the officers. *Anderson*, 247 F.3d at 130 (holding summary judgment appropriate for officers where officers shot a plaintiff when that plaintiff lowered his hands in the direction of his waistband in disregard of the officers' orders).

Plaintiffs incorrectly define the clearly established law as the right of an *incapacitated* individual to be free from a second discharge of bullets. As discussed in detail above, a reasonable officer on the scene would not conclude the first round of shots incapacitated Mr. Navarro. That much is clear from the COBAN video. Mr. Navarro was armed with a knife, acted as if he had a gun on his person, was within close range of the officers, and ignored the officers' orders not to reach down for his weapon. Mr. Navarro's actions in the six seconds between the first and second round of shots could reasonably make an officer fear for his life.

Under the circumstances present in this case, the Court holds that the Fourth Amendment did not prohibit the law enforcement officers from using the deadly force they employed. Alternatively, this Court concludes that the law enforcement officer Defendants are entitled to qualified immunity for the conduct at issue because they violated no clearly established law.

B. New Mexico Tort Claims Act

Under New Mexico law, "[f]or there to be an assault, there must have been an 'act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery.'" *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1208 (10th Cir. 2006) (quoting NMSA 1978 § 30-3-1(B)). "Battery occurs when an individual 'acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and . . . an offensive contact with the person of the other directly or indirectly results." *Id.* at 1208–09 (omission in original) (quoting *State v. Ortega*, 113 N.M. 437, 827 P.2d 152, 155 (1992)).

Because the Court concluded that Defendants did not employ unconstitutionally excessive force, Defendants cannot be liable for assault and battery under New Mexico law. *See State v. Gonzales*, 97 N.M. 607, 642 P.2d 210, 213 (Ct. App. 1982) ("Officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests. . . . When acting in good faith, the courts will afford them the utmost protection . . . .") (quoting *Mead v. O'Connor*, 66 N.M. 170, 344 P.2d 478 (1959)); *State v. Kraul*, 90 N.M. 314, 563 P.2d 108, 112–13 (Ct. App. 1977). As discussed in detail above, even construing the facts in Mr. Navarro's favor, this Court cannot conclude that Defendants used more force than reasonably necessary in this situation and therefore cannot be liable for assault and battery under New Mexico law. *See Park v. Gaitan*, 690 F. App'x 724, 744 (10th Cir. 2017) (stating where the district court's Fourth Amendment analysis

concluded the defendants did not employ unconstitutionally excessive force, those defendants could not be liable for assault and battery under New Mexico law).  Accordingly, Defendants are entitled to summary judgment on the New Mexico Tort Claims Act assault and battery claims.

C.  Negligent Hiring, Training, and Supervision

Plaintiffs did not specify whether they assert their claim for negligent hiring, training, and supervision pursuant to either federal or state law.  Under either, however, their claim fails.  In this case, this Court has held that the individual law enforcement officers did not violate the Fourth Amendment.  Under federal law, where an officer did not commit the alleged underlying constitutional violation, "there cannot be an action for failing to train or supervise the officer." *Jones v. Norton*, 809 F.3d 564, 575 (10th Cir. 2015).  Under state law, "immunity is not waived for negligent training and supervision standing alone; such negligence must cause a specified tort or violation of rights." *McDermitt v. Corrections Corp. of Am.*, 112 N.M. 247, 814 P.2d 115, 116 (Ct. App. 1991). Because both the foregoing federal and state appellate decisions make clear that a negligent hiring, training, and supervision claim is derivative, this Court grants summary judgment on Count III of Plaintiffs' Second Amended Complaint.

D.  *Respondeat Superior*

In the Second Amended Complaint, Plaintiffs again allege that the Department of Public Safety and the County Commission were responsible for the hiring, training, instructing, supervising, and disciplining of the individual law enforcement officer Defendants and that they are responsible to Plaintiffs for any harm caused by their employees or agents acting within the course and scope of their employment or agency.

The Supreme Court has long held that "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue."  *City of Canton,*

*Ohio v. Harris*, 489 U.S. 378, 385 (1989). Specifically, *respondeat superior* or vicarious liability will not attach under § 1983. *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978).

New Mexico courts have stated that an "entity or agency can only act through its employees." *Abalos v. Bernalillo Cnty. Dist. Atty's Office*, 105 N.M. 554, 734 P.2d 794, 799 (Ct. App. 1987). The waiver of immunity requires negligence or conduct of public employees while acting within the scope of their duties. *Id.*

As discussed above, the law enforcement officer Defendants did not violate Mr. Navarro's constitutional rights. Because *respondeat superior* liability does not attach under federal law, and because Defendants did not violate Mr. Navarro's constitutional rights, and thus cannot be held liable under state law for *respondeat superior*, this Court grants summary judgment on Count IV of Plaintiffs' Second Amended Complaint.

E. Loss of Consortium

In New Mexico, loss of consortium is derivative of other injuries and is not an injury in and of itself. *Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't.*, 134 N.M. 492, 79 P.3d 836, 841 (Ct. App. 2003). Because this Court concludes there is no underlying constitutional violation and loss of consortium is a derivative claim, this Court grants summary judgment on Count V of Plaintiffs' Second Amended Complaint.

V.      Conclusion

For the reasons set forth above, this Court GRANTS State Defendants' Renewed Motion for Summary Judgment and for Qualified Immunity on Plaintiffs' Excessive Force Claim (Doc. 255); GRANTS State Defendants' Renewed Motion for Summary Judgment on Plaintiffs' State Law and Derivative Claims (Doc. 254); GRANTS County Defendants' Amended Motion for

Partial Summary Judgment No. I: Dismissal of Fourth Amendment Excessive Force Claim (Doc 252); GRANTS County Defendants' Amended Motion for Partial Summary Judgment No. II: Dismissal of Plaintiffs' State Law Claims (Doc. 253); and DENIES Plaintiffs' Motion Seeking Leave to File Surreplies (Doc. 276). Because this Court grants the Motions for Summary Judgment, it DENIES AS MOOT the County Defendants' *Daubert* Motion to Exlcude Testimony of Raimund Carrillo (Doc. 137); DENIES AS MOOT the County Defendants' *Daubert* Motion to Affirmatively Admit Testimony by Dr. Daniel Duhigg (Doc. 138); DENIES AS MOOT the County Defendants' *Daubert* Motion to Exclude the Testimony of Roger Clark (Doc. 139); DENIES AS MOOT the County Defendants' Motion for Separate Trials (Doc. 142); DENIES AS MOOT the County Defendants' *Daubert* Motion to Exclude Testimony of Walter Lierman, Ph.D. (Doc. 145); DENIES AS MOOT Plaintiffs' Motion in Limine to Exclude All Testimony and Evidence Related to Angel Daniel Navarro's Mental Health History, Drug Usage History, and Conversations with Vanessa Solorzano (Doc. 153); DENIES AS MOOT Plaintiffs' *Daubert* Motion and Motion in Limine to Strike the Expert Testimony of Dr. Daniel Duhigg (Doc. 154); DENIES AS MOOT Plaintiffs' Motion in Limine to Exclude All Testimony and Evidence Prior to Individual Defendants' Involvement and Related to Information the Individual Defendants Were Not Aware At the Time of the Shooting (Doc. 155); DENIES AS MOOT Plaintiffs' Motion in Limine to Exclude Testimony Concerning Allegations of Angel Daniel Navarro's Purported Suicide By Law Enforcement Based Solely on Angel Daniel Navarro's Actions (Doc. 156); DENIES AS MOOT Plaintiffs' *Daubert* Motion and Motion in Limine to Strike the Expert Testimony of Ron McCarthy (Doc. 157); DENIES AS MOOT Plaintiffs' *Daubert* Motion and Motion in Limine to Strike the Expert Testimony of Dr. Ron Martinelli (Doc. 158); DENIES AS MOOT the State Defendants' *Daubert* Motions to Exclude the Testimony and Opinions of Roger

Clark (Doc. 159); DENIES AS MOOT the State Defendants' Motion in Limine No. 1: To Exclude Evidence that Plaintiffs' Decedent was Unarmed during Confrontation (Doc. 160); and DENIES AS MOOT the State Defendants' Motion in Limine No. 2: To Exclude Evidence That Plaintiffs' Decedent's Movements Were "Involuntary" (Doc. 161).

IT IS SO ORDERED.

Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment in this matter. It is further ORDERED that this case be DISMISSED and STRICKEN from the active docket of this Court.

Entered for the Court
this the 30th day of August, 2018

/s/ Joel M. Carson III_____
Joel M. Carson III
United States Circuit Judge
Sitting by Designation